# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7921 | **DATE** | 3/14/2001 |
| **CASE TITLE** | Donna Bavaro vs. Grand Victoria Casino | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/5/01 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Summary Judgment on Issues of Maintenance and Cure [36] is denied in part, granted in part. Defendant's Motion for Summary Judgment on Issues of Jones Act Negligence and Seaworthiness [38] is denied in part, granted in part. A status hearing is set for 4/05/01 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 15 2001 | |
| | Notified counsel by telephone. | | date docketed | 54 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 MAR 15 PM 2:01 | date mailed notice | |
| RJ | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DONNA BAVARO, )
)
Plaintiff, )
) No. 97 C 7921
v. )
) Judge Joan B. Gottschall
GRAND VICTORIA CASINO, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

**DOCKETED**
**MAR 1 5 2001**

Plaintiff Donna Bavaro (Bavaro) brought suit against her employer, defendant Grand Victoria Casino (Grand Victoria), under the Jones Act, 46 U.S.C. § 688, and general maritime law alleging that she suffered personal injury as a result of Grand Victoria's negligence and the unseaworthiness of its riverboat casino vessel, and that Grand Victoria willfully breached its obligation to pay her maintenance and cure, giving rise to a duty to compensate her for medical expenses incurred and for emotional distress caused by its failure to pay, as well as punitive damages. Grand Victoria filed two motions for summary judgment: one regarding Bavaro's Jones Act negligence and unseaworthiness claims, and the other regarding Bavaro's claim for maintenance and cure.

### Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted if the designated evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c). The moving party may meet its burden of demonstrating the absence of a triable issue by

54

demonstrating "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The party opposing a well-supported summary judgment motion may not simply rest on the pleadings, but must respond affirmatively with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In deciding a motion for summary judgment, courts construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Shank v. William R. Hague, Inc., 192 F.3d 675, 681 (7th Cir. 1999).

## Discussion

### 1. Jones Act Negligence[1]

A. Personal Injury

The Jones Act provides that any seaman who suffers "personal injury in the course of his employment" may sue for damages in a jury trial, "and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply." 46 U.S.C. § 688(a). The Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, states that "[e]very common carrier by railroad" engaged in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce" for "injury resulting in whole or in part from the negligence" of the railroad carrier.

Courts disagree about the meaning of FELA's "in whole or in part" language. The Court of Appeals for the Second Circuit construes the language in light of FELA's "broad remedial

---

[1] Bavaro has abandoned her claims based on the unseaworthiness of Grand Victoria's vessel. See Pl.'s Mem. Resp. Def.'s Mot. Summ. J. on Issues of Negligence and Unseaworthiness at 20.

2

nature" and applies a relaxed negligence standard in FELA and Jones Act cases. See Williams v. Long Island R.R. Co., 196 F.3d 402, 406 (2d Cir. 1999). Similarly, until 1997 the Court of Appeals for the Fifth Circuit applied a "slight negligence" standard in these cases based upon a gradual extension of language contained in a 1957 Supreme Court case. See Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335-37 (5th Cir. 1997) (en banc) (overruling Jones Act/FELA "slight negligence" standard and tracing its origin to cases misapplying language of Rogers v. Missouri Pac. R.R., 352 U.S. 500, 506 (1957)). In Gautreaux, the Fifth Circuit en banc held that the Jones Act does not impose a higher than usual standard of care upon defendants and that, rather than modifying an employer's duty to its employee, the statutory "in whole or in part" language applies to the role that employer negligence plays in an employee's injury. 107 F.3d at 335-36 (holding that "in whole or in part" applies only to the showing of causation required of the injured party at trial); see also Ribitzki v. Canmar Reading & Bates, Ltd., 111 F.3d 658, 664 (9th Cir. 1997) (applying so-called "featherweight causation standard" in Jones Act case).

Despite the confusion in the case law surrounding FELA's "in whole or in part" language, all of the cases recognize that Jones Act/FELA plaintiffs have a lighter evidentiary burden than plaintiffs who allege personal injury in the usual context, and this awareness of the low evidentiary threshold for submitting claims to the jury counsels caution when considering whether to grant summary judgment to defendants in Jones Act/FELA cases. See Moreno v. Grand Victoria Casino, 94 F. Supp.2d 883, 893 (N.D. Ill. 2000); see also Ribitzki, supra, 111 F.3d at 664 (test for submission to jury is whether the evidence supports a conclusion "that employer negligence played any part, even the slightest, in producing the injury . . . for which damage is sought") (quoting Rogers, supra, 352 U.S. at 506); Williams, supra, 196 F.3d at 406-7

(same); Gautreaux, supra, 107 F.3d at 335 (explaining that "slightest" in Rogers referred to the quantum of evidence necessary to sustain a jury verdict). While this court's reading of the FELA statute leads it to agree with Gautreaux's holding that a standard of ordinary care applies in Jones Act cases, the court is mindful that the lighter evidentiary burden imposed upon Bavaro affects its consideration of whether her claims should survive summary judgment. See Gautreaux, supra, 107 F.3d at 336; Ribitzki, supra, 111 F.3d at 663-64; Moreno, supra, 94 F. Supp.2d at 893 (citations omitted).

Bavaro's first claim for negligence rests upon Grand Victoria's alleged failure to exercise ordinary care to provide her with a reasonably safe place to work in violation of the Jones Act. See Moreno, 94 F. Supp. at 893 (citing Bailey v. Cent. Vt. Ry., 319 U.S. 350, 352-53 (1943) and discussing duties imposed upon employers by the Jones Act). As she arrived at work on the morning of July 13, 1996, Bavaro slipped and fell on some stairs in Grand Victoria's parking garage. A three-story staircase, made up of three sets of opposite-facing flights of stairs connected by small landings, with large landings at each level of the parking garage, leads up to a skywalk that connects the garage to Grand Victoria's land-based pavilion where people board its gambling boats. See Pl.'s Fact ¶¶ 1-2[2]. From the second parking level, Bavaro ascended the first flight of steps and rounded the small landing, then began to climb the remaining steps to the third level and skywalk. Id. ¶¶ 3-4. She did not see anything on the steps, but she slipped, fell, and injured herself. Id. ¶¶ 4-9. Bavaro maintains that an unidentified water-based liquid must have covered at least two of the staircase steps, because her knees landed on two different steps when

---

[2] Citations are to numbered paragraphs of the parties' statements of material facts and incorporate the parties' citations to evidence supporting their assertions.

4

she fell, and she later discovered that both pant legs were "dripping" wet at the knees. Id. ¶ 8. Though no one, including Bavaro, saw anyone spill anything on the stairs on the morning of her fall, Bavaro assumes that she slipped on coffee or soda, because Grand Victoria employees frequently carry drinks into work in the morning, and patrons leaving the casino after the boat closes around 6:00 a.m. carry away cups of coffee to help them stay awake for the ride home. Id. ¶¶ 7, 12. Bavaro has no other evidence about the liquid's smell, taste, etc., to identify it or its source.

During the summer of 1996, foot traffic in Grand Victoria's parking garage stairwell increased in the mornings beginning at 6:00 a.m. when the casino closed and patrons and employees disembarked the boat. Pl.'s Fact ¶ 11. Beginning at 7:00 a.m., customers and employees began to arrive for the morning work shift and early cruise. Id. ¶ 10. Bavaro testified that "just about everybody" reporting to work for the morning shift carried drinks into work. Id. ¶ 12. Grand Victoria sold various beverages to patrons on its boat and land-based pavilion and furnished drinks to employees in a break room. Def.'s Fact ¶ 39; see also Def.'s Ex. G, Haayer Dep. at 59. Grand Victoria believes that it prevented employees and patrons from carrying beverages on or off the vessel by posting security guards in the vessel boarding area and requiring everyone to discard beverage containers before disembarking. Def.'s Fact ¶¶ 36-38. It also claims that patrons could not have purchased any beverage to take away at 6:00 a.m. on the date in question, because all of the restaurants, snack bars, and lounges in the casino pavilion had been closed for several hours. Id. ¶¶ 39-40. According to Bavaro and another witness, Grand Victoria's attempts to prevent people from taking drinks off the boat were ineffective, because drinks were often smuggled out. Pl.'s Resp. to Def.'s Fact ¶ 37; Pl.'s Fact ¶ 12. Other evidence

5

indicates that Grand Victoria failed to prevent beverages from being transported from its boat and land-based pavilion to the parking garage, for example, the presence of glasses and styrofoam cups (along with cigarette butts, paper, and other trash) along the third-floor covered walkway and in the large landing areas between sets of stairs in the garage. Pl.'s Fact ¶ 14. Discarded beverage containers often littered the large third-floor landing area at the top of the staircase, and employees habitually congregated on the large second-floor landing during breaks, leaving cups and soda cans sitting on the ledge when they were done. Id.; see also Def.'s Ex. F, Sanchez Dep. at 19. On at least "a couple" of occasions, one witness saw spilled soda on the ground in the large landing areas of the stairwell. Pl.'s Fact ¶ 15. Sanchez, a maintenance worker who at some point during his employment with Grand Victoria was assigned to clean the garage stairs, testified that he "rarely," but "sometimes," had to mop up spills on the stairs. Def.'s Ex. F, Sanchez Dep. at 20.

Bavaro also presented evidence that Grand Victoria had at least one security surveillance camera in the garage stairwell area, which once recorded a patron vomiting there. Pl.'s Fact ¶ 17. The security personnel monitoring the camera notified the maintenance department via radio and maintenance employees acted immediately to prevent people from stepping in the mess and to clean it up. Id. In addition, the camera recorded a patron setting a trash can on fire. Id. ¶ 18. Hines, a maintenance manager, testified that he used surveillance tapes to check up on his employees and ensure they were keeping the stairwell area clean; he was able to observe cigarette butts in the vicinity of the stairwell. Id. In an affidavit, Hines clarified his testimony by saying that he never saw the small landing between the second and third levels, where Bavaro fell, on a surveillance tape. Grand Victoria maintains that the area of the stairs where Bavaro fell cannot

6

be viewed by any of its surveillance cameras, but the court cannot determine from the photocopied image provided to it by Grand Victoria whether security personnel could see any part of the landing or steps where Bavaro fell.

Grand Victoria apparently recognized that the stairwell was a potentially dangerous area, because its maintenance employees and managers understood that keeping the stairs clean was a "top priority for safety." See Def.'s Ex. G, Haayer Dep. at 18-19, 47; Pl.'s Ex. A, 2/16/00 Hines Dep. at 25 (stairwell was high traffic customer area monitored by cameras for safety reasons); Def.'s Ex. F, Sanchez Dep. At 62 (it was important to keep the stairs perfectly clean so no one would fall). Grand Victoria claims that its practice was to clean and inspect the stairwell area at regular intervals throughout the day, but Grand Victoria's work schedule reveals that, contrary to the assertions of its maintenance supervisors (Hines and Haayer), Grand Victoria may not have assigned a worker to clean and inspect the stairs on a daily basis and may not have done so on the day in question. See Pl.'s Fact ¶¶ 24-29. The work schedule upon which Grand Victoria relies does not clearly establish who was in charge of maintaining the stairwell, either on the morning of Bavaro's fall or on a regular basis. In addition, Bavaro presented evidence to discredit Grand Victoria's assertion that Sanchez was assigned to clean and inspect the stairs on the day that she fell; Sanchez's deposition testimony reveals that he was at least confused as to whether he worked that day. Id.

Grand Victoria is liable if it knew or should have known "of a potential hazard in the workplace, yet fail[ed] to exercise reasonable care to inform and protect its employees." Moreno, supra, 94 F. Supp.2d at 893 (quoting Gallose v. Long Island R.R., 878 F.2d 80, 84 (2d Cir. 1989)). Reasonable care is determined in light of whether or not a particular danger was

7

foreseeable. Id. (citing Gallick v. Baltimore & O.R.R., 372 U.S. 108 (1963)). Grand Victoria argues that Bavaro can recover only if Grand Victoria had actual or constructive notice of the liquid on the stairs, as might be demonstrated if the spill had been there for a long period of time. Bavaro has no evidence that anyone had actual notice of the spill, and Grand Victoria contends that Bavaro cannot charge it with constructive notice because she has no evidence of how long the condition existed. Haayer walked the staircase every morning, including the morning of Bavaro's fall, to conduct a brief (two to three minute) inspection of its condition. She never saw a spill on the stairs. Haayer's inspection typically occurred between 7:30 a.m. and 7:50 a.m., and Bavaro fell around 7:45 or 7:50 a.m., so if the spill happened after Haayer's inspection, it occurred at most twenty minutes before Bavaro's fall. It is possible that the spill was on the stairs and that Haayer simply missed it; but, Bavaro has no evidence to indicate how much time passed between the spill and her fall. Even if Grand Victoria's security personnel could have seen a spill via the camera, there is nothing to indicate whether the spill occurred twenty minutes (or even more) rather than one minute before her fall, or that security personnel had time to contact maintenance and have them clean it up.

Before liability may attach, a defendant must have actual or constructive knowledge of an unsafe condition so as to furnish it with an opportunity to correct the condition. Perry v. Morgan Guar. Trust Co., 528 F.2d 1378, 1380 (5th Cir. 1976); Colburn v. Bunge Towing, Inc., 883 F.2d 372, 374 (5th Cir. 1989). However, plaintiffs need not in every case prove how long a spill existed in order to show that the defendant should have known about it. A plaintiff may still recover if she can establish a pattern and practice of "dangerous conditions that were not attended to within a reasonable period of time." Culli v. Marathon Petroleum Co., 862 F.2d 119, 126 (7th

Cir. 1988) (upholding jury verdict for negligence plaintiff who could not prove the length of time the spill existed).

A jury hearing this case might find, in light of the number of beverages being carried and left on and near the stairs, the heavy volume of people on the stairs during the morning hours, and the fact that spills did occur occasionally in this area, that Grand Victoria acted unreasonably by failing to ensure that a maintenance person cleaned and inspected the stairs often enough (or at all on the morning in question), by conducting only one brief managerial inspection during the busy time, and by not monitoring the surveillance cameras more carefully (assuming the jury finds that at least part of the area in question could be "seen" by the camera). Though not overwhelming, there is some evidence that Grand Victoria knew its stairs could be dangerous yet failed to assign someone specifically to clean and inspect the stairs every morning, including the morning that Bavaro slipped and fell. This is a close case because Bavaro's evidence is thin even when all reasonable inferences are drawn in her favor, but the court recognizes that the "amount of evidence to support a jury verdict" in a Jones Act case is "slight." Gautreaux, supra, 107 F.3d at 336; Anderson, supra, 477 U.S. at 255. In light of the "special care" and caution that must be exercised in considering summary judgment in Jones Act negligence cases, the court must deny Grand Victoria's motion for summary judgment with respect to Bavaro's claim that Grand Victoria failed to furnish a safe working environment. See Moreno, supra, 94 F. Supp.2d at 893 (citations omitted).

B. Failure to Provide Maintenance and Cure

Bavaro asserts a Jones Act claim, separate from her claim under general maritime law for a seaman's maintenance and cure remedy, for damages resulting from Grand Victoria's alleged

negligent failure to provide her with maintenance and cure. Due to the nature of the employment relationship, seamen who are injured in the service of their ships are entitled to maintenance (food and lodging while ashore) and cure (necessary medical services) regardless of shipowner negligence. See Watters v. Harrah's Ill. Corp., 993 F. Supp. 667, 669 (N.D. Ill. 1998) (citations omitted). Courts have recognized a distinction between a contract-like action for maintenance and cure, in which an injured seaman seeks payment of the expenses covered by maintenance and cure, and a tort-like action brought when a seaman suffers additional injury as a result of the employer's negligent or willful failure to pay maintenance and cure (for example, the aggravation of an injury due to the seaman's inability to afford medical treatment absent the employer's cure payment). Id. Bavaro's contract-type claim for cure, or medical expenses, is addressed below. In addition to that claim, Bavaro seeks compensation for emotional distress and suffering that allegedly resulted from her anxiety about how to pay her mounting medical bills, her receipt of attorney collection letters from health care providers, etc., arising from Grand Victoria's wrongful denial of its responsibility to pay her maintenance and cure.

Bavaro may bring a Jones Act negligence action seeking recovery of damages caused by Grand Victoria's failure to pay maintenance and cure; however, any such claim is limited to damages caused by aggravation or extension of a physical injury. FELA (and therefore the Jones Act) does not allow damages for emotional distress or similar injuries unless they are related to a physical injury or threat of physical harm. Consolidated Rail Corp. v. Gottschall, 512 U.S. 532 (1994) (permitting plaintiffs to recover for emotional distress under FELA if they sustain a physical impact from, or are placed in immediate risk of physical harm by, a defendant's negligence ("zone of danger" test)). Bavaro's alleged emotional injuries were not caused by any

10

worsening of her physical condition that occurred because Grand Victoria did not provide her with proper medical care. To the contrary, Bavaro received medical treatment for her injuries, and her only distress is a result of worrying about the financial aspect of who would pay for portions of the care she received. Damages for emotional injuries, such as Bavaro's, that are unrelated to a physical condition or occurrence are not available under the Jones Act,[3] and the court grants summary judgment in favor of Grand Victoria on this issue.

2. Motion for Summary Judgment: Maintenance and Cure[4]

This court denied Bavaro's motion for maintenance and cure in an Order dated December 30, 1998. The court declines Grand Victoria's invitation to revisit its prior analysis of whether Bavaro was "in the service of" her ship when she was injured, as required to be eligible for maintenance and cure benefits. As stated in this court's previous Order, Bavaro was acting "in the course of employment" when she fell, which means that she was also acting in the service of her ship. See Ex. 1 to Def.'s Mem. Supp. Mot. Summ. J. on Issues of Maintenance and Cure

---

[3] Because Bavaro brought this claim expressly under the Jones Act, the court need not decide whether similar claims are available under general maritime law or whether such claims would be co-extensive with Jones Act claims. See Watters, supra, 993 F. Supp. at 673 (holding Miles uniformity principle, that plaintiff cannot recover damages under general maritime law when the claim is also covered by a statutory regime that would not allow such damages, is invoked because tort-like maintenance and cure claims under maritime law overlap with Jones Act claims). Watters followed Guevara v. Maritime Overseas Corp., 59 F.3d 1496 (5th Cir. 1995), which held that since denial of maintenance and cure gives rise to a Jones Act action, the Miles uniformity test must be applied, and that because punitive damages are not available in a suit for denial of maintenance and cure under the Jones Act, they are unavailable in a general maritime law action). In addition, Sullivan v. Tropical Tuna, 1997 A.M.C. 2017, 2020 (D. Mass. 1997), cited in and attached to Bavaro's response memorandum, is distinguishable because the claim regarding denial of maintenance and cure was not brought under the Jones Act; furthermore, although that decision cited the "uncertainty" faced by plaintiff about whether he would be able to get his finger repaired, the case also involved the prolonging of physical pain and suffering resulting from defendant's actions that delayed plaintiff's surgery.

[4] Bavaro abandoned her claim for punitive damages based on Grand Victoria's alleged willful refusal to pay her maintenance and cure benefits. See Pl.'s Mem. Resp. Def.'s Mot. Summ. J. on Issues of Maintenance and Cure at 19.

11

(Court's 12/30/98 Order regarding maintenance and cure); Braen v. Pfeifer Oil Transp. Co., 361 U.S. 129, 131 (1959) (equating "in the service of the ship" with "in the course of employment"). Grand Victoria offers no support for its claim that "in the service of the ship" under general maritime law does not encompass the Jones Act and FELA's "in the course of employment" standard; in fact, it attempts to rely upon a Jones Act "in the course of employment" case to support its position that Bavaro was not "in the service of" her ship when she was injured. See Def.'s Mem. Supp. Mot. Summ. J. on Issues of Maintenance and Cure at 10 (citing Soriano v. Treasure Chest Casino, 1996 WL 499037 (E.D. La. 1996)). The court denies Grand Victoria's motion for summary judgment with respect to this issue.

The court finds that Grand Victoria is entitled to a set-off of monies paid to Bavaro under its group health insurance plan against any sum it owes to Bavaro for maintenance and cure. Bavaro failed to establish that Grand Victoria's failure to plead set-off as an affirmative defense prejudiced her in any material way; the most she alleged was that she was denied the opportunity to conduct discovery into Grand Victoria's "loss experience," which is irrelevant to the court's decision regarding set-off of Grand Victoria's maintenance and cure obligations.

The purpose of maintenance and cure is to ensure that seamen receive needed medical treatment; an employer has no duty to pay a seaman's cure expenses if cure is furnished by another party at no expense to the seaman, including payments by the employer's group health insurer. See Shaw v. Ohio River Co., 526 F.2d 193, 201 (3d Cir. 1975) (employer-funded Blue Cross health insurance); Moran Towing & Transp. v. Lombas, 58 F.3d 24, 27 (2d Cir. 1995) (Medicare); Davis v. Odeco, Inc., 18 F.3d 1237, 1246 (5th Cir. 1994) (employer-sponsored health insurance). An examination of the relevant provisions of Bavaro's health insurance

12

contracts reveals that Bavaro is probably not obligated to repay her health insurers for recovery of maintenance and cure benefits, because the insurers require repayment only of sums she recovers from parties found responsible for her injury, while the maintenance and cure obligation is not based upon fault. See Shaw, supra, 526 F.2d at 201 (holding collateral source rule, which bars tortfeasors from reducing damages owed to plaintiffs by the amount plaintiffs recover from independent sources, does not apply to "the no-fault obligation to furnish maintenance and cure"); Moran, supra, 58 F.3d at 27 (same); see also Davis, supra, 18 F.3d at 1245-46 (distinguishing set-off of plaintiff's recoveries under Jones Act as opposed to maintenance and cure). However, to the extent that Bavaro's obligations to repay her health insurer are triggered by any payment of maintenance and cure, no set-off will be available to Grand Victoria. The court's decision on this issue relates only to maintenance and cure and not to any amount Bavaro might recover under her Jones Act negligence claims. The amount of set-off to which Grand Victoria is entitled will be determined after the full extent of its maintenance and cure liability to Bavaro has been established.

## Conclusion

Grand Victoria's motion for summary judgment on Jones Act negligence and unseaworthiness is denied as to Bavaro's negligence claim arising from her slip and fall; it is granted as to Bavaro's claim for unseaworthiness and for emotional damages arising from Grand Victoria's negligent failure to pay maintenance and cure. Grand Victoria's motion for summary judgment on issues of maintenance and cure is denied as to the issue of whether Bavaro was in the service of her ship at the time of her accident, and granted as to Grand Victoria's right to a set-off of maintenance and cure benefits for payments made to Bavaro under Grand Victoria's

13

health insurance plan (to the extent Bavaro would otherwise realize a double recovery for those expenses). A status hearing is set for April 5, 2001 at 9:30 a.m.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: March 14, 2001